LaeamoRe, Judge,
delivered the opinion of the court:
This case is' in effect a contest 'between plaintiff surety company and the third party defendant, an assignee bank. Plaintiff is seeking judgment for the amount of a progress payment made under a Government contract plus the amount remaining due and payable from the United States on the contract in question. The Government’s position herein is that of a stakeholder without monetary interest in the outcome of this case. However, since the Government is of the opinion that a decision of this case might substantially affect the Government’s rights under all Government construction contracts, it has filed a brief and made an argument relative to its independent legal position in this case.
It is, of course, the position of the third party defendant, Terre Haute First National Bank, assignee of the contract in issue, that it is entitled to the money withheld by the Government to the extent of $36,388. The Government takes a similar position.
The facts briefly are as follows: J. E. Russell and Son Construction Company, the contractor, entered into a contract dated April 17, 1957, for construction of a service club building at Bunker Hill Air Base, Bunker Hill, Indiana. Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and the contractor executed two bonds securing performance of the contract and payment to persons supplying labor and materials, and furnished them to defendant. Both bonds were dated April 17,1957, although actually executed after that date. On or about May 6,1957, the contractor executed a valid and legal assignment to the third party defendant herein, the Terre Haute First National *698 Bank. Due notice of this assignment, which was executed for the purpose of obtaining funds with which to defray construction, labor, and material costs, was given to the Government and the plaintiff surety. Thereafter, the contractor duly entered into performance of the contract work and the Bank received several progress payments from defendant during the course thereof.
On February 21, 1958, a representative of the plaintiff became aware that the contractor was in financial difficulty, and had a private conference with the contractor concerning such on February 28, 1958. At this time, the contract, although behind schedule, was still being performed, with approximately 60 percent of the work already completed. Neither the plaintiff surety nor the contractor furnished any information to the Government concerning this conference. Prior to the conference, on or about February 26, 1958, the contractor had submitted its partial payment estimate No. 9 to defendant. This estimate covered work performed by the contractor during the month ending February 24,1958. On March 12 or early on March 13,1958, the contractor requested defendant to expedite the issuance of a check on partial payment estimate No. 9. This request was granted, as a similar request had been granted to the contractor on at least one previous occasion, and check No. 133355 in the amount of $36,388, the disputed payment herein, was mailed to the Bank on March 13, 1958. Payments on partial payment estimates of a contractor were usually expedited upon request when the money was needed to meet a payroll.
On March 13,1958, the plaintiff surety and the contractor had a second conference relative to the contractor’s financial problems. On the same day, following the conference, plaintiff sent a letter to defendant requesting that progress payments be paid only to plaintiff, in view of the contractor’s financial situation. This letter was received by defendant after it had mailed check No. 133355 to the Bank, and was the first notice received by defendant from plaintiff.
On March 14, 1958, plaintiff telephoned defendant and, upon being advised that check No. 133355 had been mailed to the Bank, requested that payment on the check be stopped. This request was denied for lack of an appropriate basis for *699 such action. On the same day, plaintiff obtained a temporary order from an Indiana state court restraining the Bank from collecting the proceeds of check No. 133355, which order remained in effect until June 6,1958. Also on the same day, plaintiff instituted the present action in the Court of Claims. As of March 14,1958, the contract was still being performed with all subcontractors, save one, being on the job. On March 31,1958, all work on the contract came to a stop and on April 8,1958, the Government terminated the contract for default.
After the default, the plaintiff surety entered into a contract to complete the remaining work, and prosecuted the work to completion. The proceeds of check No. 133355 are the principal amount withheld by defendant pending the outcome of this litigation. At the time plaintiff obtained its restraining order it had not satisfied any obligations of the contractor. Also at that time the plaintiff had received only two demands totaling less than $13,000. Plaintiff made its initial payment on May 7, 1958.
Thus two questions are present in this controversy. First, is the plaintiff surety company entitled to the proceeds of the check issued in the amount of $36,388, representing a progress payment for work performed by the contractor during the month ending February 24,1958. Second, is the plaintiff surety company entitled to the additional amount of $8,612, representing part of the retained percentages out of the contractor’s earnings prior to time of default, less liquidated damages assessed against the contractor.
In respect to the latter issue, the contractor, although duly served with process under the rules of this court, has not appeared in the present case. In any event there appears to be no reason why the contractor has a legitimate claim to the amount in excess of the check issued. Furthermore, the third party defendant has made no claim for this amount. Consequently, we hold that plaintiff is entitled to recover, and judgment will be entered for plaintiff against defendant in the amount of $8,612.
The final issue, therefore, is whether the plaintiff surety or the third party defendant is entitled to the remaining funds held by the Government as a stakeholder.
*700 At the outset, we are not unmindful of the position taken by this court in a number of previous decisions to the effect that the equity of a surety on a Government construction contract is superior to the rights acquired by a bank under a valid legal assignment from the contractor. National Surety Corporation, et al. v. United States, 132 Ct. Cl. 724, and cases cited therein. The facts here show, however, that this case is clearly distinguishable from the cases above cited. The gravamen of the National Surety Corporation case, and cases cited therein, is that the contractor had defaulted, thereby giving its surety a superior right as subrogee of the United States. In the instant case, at the time the work was performed for which the progress payment in issue was made, the contractor was not in default. Nor was the contractor in default at the time the check was issued by the United States. Nor was the contractor in default at the time the Indiana state court restrained the Bank from cashing said check. Nor was the contractor in default when the present action was instituted in this court. The plaintiff’s case is bottomed on the proposition that the surety’s equity in the money withheld by the Government is superior to the rights of the Bank. This may be true, when the contractor is in default, as was stated by this court in the principal case relied on by plaintiff. In National Surety Corporation v. United States, supra, the court stated at page 727:
No one seems to deny that the rights of a surety on a performance bond are superior to the rights of a bank as the contractor’s assignee. This is because, as held in the Prairie State Bank case, the surety is subrogated to the rights of the United States, and the United States had the right to use the money in its hands to complete the contract on the idefault of the oontraetor. [Italic supplied.]
However, in the instant case when all this action took place, the contract was still being performed by the contractor and all subcontractors, save one, were on the job. True, the contractor was behind schedule. It is also true that plaintiff was in possession of information to the effect that the contractor’s financial position was unsound and two conferences were held between plaintiff and the contractor *701 in an attempt to alleviate the situation. The Government was not appraised of this situation at the time, and it is conceivable that had the Government been given the information regarding nonpayment of laborers and material men, the contracting officer might have assured payment without.causing a work stoppage and resulting default. In this situation the contractor could have extracted himself from the position of being forced into default on the contract. • This possibility was clearly permitted under clause 25 of the contract, which provided:
25. WITHHOLDING OF FUNDS TO ASSURE WAGE PAYMENT
There may be withheld from the Contractor so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics employed by the Contractor or any subcontractor the full amount of wages required by this contract. In the event of failure to pay any laborer or mechanic all or part of the wages required by this contract, the Contracting Officer may take such action as may be necessary to cause the suspension, until such violations have ceased, of any further payment, advance, or guarantee of funds to or for the Government Prime Contractor.
However, even at the time this action was instituted, only two demands for payment by laborers and material men had been received and this only in the amount of something less than $13,000.
Tn two weeks all work stopped and shortly thereafter the contracting officer terminated the contract for default and called in plaintiff’s surety who then completed the contract.
Thus the plaintiff is demanding payment of a contract fund due before default and before a single dollar had been paid out by the surety. Moreover, the claim is for payment of funds far in excess of the demands of the laborers and materialmen.
Tn this posture the present case is entirely similar to the case of American Fidelity Company v. National City Bank of Evansville, 266 F. 2d 910. In that case a surety ón a Government construction contract sought reimbursement of sums paid out by it by suing the assignee bank for progress *702 payment collected by the bank prior to the contractor’s default. The court therein stated:
Thus it is seen that a surety has the right to be subro-gated, as of the date of his bond, to the rights and preferences of anyone to or for whom he is thereafter required to pay. This right is potential only until the contractor’s default causes the surety to pay. It is a shadowy thing until it is given substance by the occurrence of a loss to the surety; theretofore a mere right to subrogation, it then becomes an actuality, [p. 914]
This same conclusion was reached by the Court of Appeals for the Ninth Circuit in Bank of Arizona v. National Surety Corporation, 237 F. 2d 90.
That the surety company had no exercisable right of subrogation prior to loss by it was recognized in Prairie State Bank v. United States, 164 U.S. 227, wherein the Supreme Court stated:
That Hitchcock, as surety on the original contract, was entitled to assert the equitable doctrine of subrogation is elementary. That doctrine is derived from the civil law, and its requirements are, as stated in Aetna Life Insurance Company v. Middleport, 124 U.S. 534: “1, that the person seeking its benefits must have paid a debt due to a third party before he can be substituted to that party’s rights; * * *. [p. 231]
Thus, when the defendant mailed the check to the Bank there was no valid reason why the Government should not have made a progress payment. This is especially true in that at no time was the Government notified of any default or lag in payments to laborers or material men. Cf. United States Casualty Co. v. First National Bank of Columbus, 157 F. Supp. 789.
Furthermore, at the time the plaintiff was not out of pocket one cent. The money in issue was earned prior to default and since the moneys furnished by the Bank to the contractor prior to default were loaned for use in the performance of the contract, it can reasonably be presumed that said moneys were used to pay laborers and material men that plaintiff would have otherwise had to pay.
Under the facts and circumstances of the transaction, the Government had the complete right to make a progress pay *703 ment under the contract, and it stands to reason that if the Government had the right to pay out the money, the assignee bank had the right to receive and retain the proceeds thereof.
For the reasons above stated, the plaintiff is entitled to recover from the defendant the sum of $8,612; the third party defendant, Terre Haute First National Bank, is entitled to recover from the United States the sum of $36,388; and judgment will be entered in these amounts.
It is so ordered.
Davis, Judge; Durfee, Judge; Whitaker, Judge, and Jones, Ohief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, National Union Fire Insurance Company of Pittsburgh, Pa., is a corporation duly organized and existing under the laws of the State of Pennsylvania. At all times material to this litigation, it was duly qualified to act as a surety on performance and payment bonds given by contractors in connection with public works of the United States under the provisions of the Miller Act (40 U.S.C. 270a).
2. Pursuant to a motion filed by the plaintiff under Rule 19, a third-party notice was issued to and served on the Terre Haute First National Bank, which thereupon filed a petition claiming an interest in the subject matter of the suit. The Terre Haute First National Bank is a corporation duly authorized to conduct a banking business and to receive and accept assignments under the Assignment of Claims Act of 1940, as amended (31 U.S.C. 203).
3. This litigation grew out of a contract dated April 17, 1957, which J. E. Russell, Fred Russell, and James Russell, a partnership doing business as J. E. Russell and Son Construction Company, entered into with the defendant (acting through a contracting officer of the Bureau of Yards and Docks, Department of the Navy) for the construction of a service club building at the Bunker Hill Air Force Base, *704 Bunker Hill, Indiana. The contract was numbered NBy-12599, and it provided for the payment of a fixed price ($640,389) to the contractor. Work on the contract was to be completed by May 15, 1958, and provision was made for the assessment of liquidated damages against the contractor in the event of a failure to meet the prescribed completion date. (The Bussell partnership will usually be referred to in subsequent findings as “the contractor,” and contract No. NBy-12599 will usually be referred to as “the contract.”)
4. Although the contractor was duly served with process under Bulé 19, no appearance in the present case has been filed for or on behalf of the contractor, and the time for filing such appearance has now expired.
5. (a) Clause 5 of the “General Provisions” of the contract, as amended by Clause 47 of the “Additional General Provisions,” dealt with the subject of termination for default and provided as follows:
5. TERMINATION FOR DEFAULT — DAMAGES FOR DELAT— ■TIME EXTENSIONS
(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the Contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby, and for liquidated damages for delay, as fixed in the specifications or accompanying papers, until such reasonable time as may be required for the final completion of the work, or if liquidated damages are not so fixed, any actual damages occasioned by such delay. If the Contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor.
(b) If the Govermnent does not terminate the right of the Contractor to proceed, as provided in paragraph (a) hereof, the Contractor shall continue the work, in which event he and his sureties shall be liable to the *705 Government, in the amount set forth, in the specifications or accompanying papers, for fixed, agreed, and liquidated damages for each calendar day of - delay until the wort is completed or accepted, or if liquidated damages are not so fixed, any actual damages occasioned by such delay.
(c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to causes other than normal weather beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: Provided, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof.
(d) Any notice of termination hereunder shall specify that termination of work hereunder shall be effected by delivery to the Contractor of a Default Notice of Termination specifying that termination is for default or failure, the extent to which performance of work under this contract shall be terminated, and the date upon which such termination shall become effective. After receipt of a Default Notice of Termination and except as otherwise directed by the Contracting Officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Default Notice of Termination; (2) assign to the Government or to such party or parties as the Contracting Officer may direct, in the manner and to the extent directed by the Contracting Officer, all of the right, title *706 and interest of the Contractor under orders and subcontracts to the extent that they relate to the performance of any work terminated by the Default Notice of Termination; (3) to the extent not required for performance of work under this contract not terminated by the Default Notice of Termination, transfer title and deliver to the Government or to such other party or parties as the Contracting Officer may direct, in the manner, to the extent and at the times directed by the Contracting Officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies and other material produced as a part of, or acquired in respect of the performance of, the work terminated in the Default Notice of Termination, (ii) the plans, drawings, information and other property which, if the contract had been completed would be required to be furnished to the Government and (iii) construction equipment, tools and spare parts acquired for or allocated to the performance of the work; (4) complete Eerformance of such part of the work as shall not have een terminated by the Default Notice of Termination; and (5) take such action as may be necessary or as the Contracting Officer may direct for protection and preservation of property which is in the possession of the Contractor and in which the Government has or may acquire an interest.
(e) In addition to its other remedies, the Government may, with respect to work terminated as provided in this Clause, complete such work or any part thereof in such manner and by such means and with such changes therein as it may deem advisable. If the Government elects to complete less than all of such work, or to make changes therein, the contract price (adjusted as of the effective date of termination pursuant to other provisions of this contract) shall for the purpose of this paragraph be further adjusted, in the manner provided in Clause 3 in case of a change, to reflect such deletion or changes in the work made after the the [sic] effective date of termination, and all references hereinafter made in this paragraph (e) to the contract price shall be deemed made to the contract price as so finally adjusted. In effecting the completion of work under this Clause, the Government may, in addition to all rights otherwise conferred, take possession of and utilize such material, equipment and plant as may be at the site of the work or on order and which the Contracting Officer may deem necessary or useful in facilitating such com *707 pletion. Upon completion of such work, or so much thereof as is to be completed, the Contracting Officer shall determine the cost to the Government of such completion, which determination shall be final, subject only to appeal under Clause 6. If the cost of such completion, plus all payments otherwise made to the Contractor, exceeds the contract price, the excess cost shall be charged to the Contractor and the Contractor or his surety, if any, shall pay such amount to the Government upon demand. Such amount shall be in addition to the liquidated damages to be paid under Clause 5. .
. (f) Upon termination of work pursuant to this Clause, the Government, but without duplication of any amounts, shall pay the Contractor the following amounts:
(1) For work performed which is in place at the site on the effective date of termination and for work not terminated by the Default Notice of Termination: The reasonable value thereof (including in the discretion of the Contracting Officer, a fair profit) as determined by agreement of the parties. In no event shall the total value so determined exceed a percentage of the contract price (adjusted as of the effective date of termination pursuant to other provisions of the contract) equivalent to the percentage of work under the contract as a whole (adjusted as of the effective date of termination pursuant to other provisions of the contract) represented by work which is in place at the site on the effective date of termination plus the work not terminated by the Default Notice of Termination.
(2) For all property transferred and delivered to the Government, or its designee or designees, pursuant to paragraph (d)(8) of this Clause: The. reasonable value of such property (without duplication of any amount fixed under paragraph (f)(1), and including in the discretion of the Contracting Officer, a fair profit) as determined by agreement of the parties.
(3) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (d)(5) of this Clause as determined by agreement of the parties.
(4) The reasonable value or reasonable rental value, as the case may be, of material, equipment and plant utilized by the Government under the provisions of paragraph (e) of this Clause, as determined by agreement of the parties, provided that the risk of loss of or damage to such equipment and plant shall be in the *708 Contractor during the period so utilized by the Government.
If the parties are unable to agree upon any of the values, costs, or percentages referred to in this paragraph (f), then the values, costs or percentages as to which such agreement is lacking shall be determined by the Contracting Officer, which determination shall be final, subject only to appeal under the provisions of Clause 6. Except for normal spoilage and to the extent that .the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraphs (f)(1), (f)(2), and (f)(4), all amounts allocable to or payable in respect of property which is destroyed, lost, stolen, or damaged prior to delivery to the Government.
(g) The obligation of the Government to make any payment under this Clause: (1) shall be subject to deductions in respect to (i) all unliquidated partial or progress payments, payments on account theretofore made to the Contractor and unliquidated advance payments, and (ii) any claim which the Government may have against the Contractor in connection with this contract (including without limitation any claims under paragraph (e) of this Clause); (2) in the discretion of the Contracting Officer shall be subject to deduction in respect of the amount of any claim of any subcontractor or supplier whose subcontract or order is related to the performance of this contract; and (8) shall be subject to the condition that payment of that portion of the amount to be paid the Contractor on account of the completion of the part of the work which is not terminated by the Default Notice of Termination shall be made at the times and in the manner provided in Clause 7 with respect to partial payments and final payment for the performance of the work.
(h) This contract shall not be terminated and the Contractor shall not be charged with any liability to the Government under the provisions of this Clause where the default or failure of the Contractor is due to causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to those causes with respect to which it is provided in Clause 5 that the Contractor shall not be charged with liquidated damages for delay. In the event that a Default Notice of Termination has been delivered to the Contractor and it is thereafter deter *709 mined that the default or failure is due to causes beyond the control and without the fault or negligence of the Contractor, performance of work under this contract shall be deemed to have been terminated, effective as of the effective date of the Default Notice of Termination, pursuant to Clause 48. The Government shall, in case of such determination, promptly cancel the notice under this article and shall issue the notice provided in paragraph (a) of Clause 48, and the rights and obligations of the parties shall in such event be governed by Clause 48.
(i) The Government shall make partial payments and payments on account, from time to time, of the amounts, if any, to which the Contractor shall be entitled under this Clause, whether determined by agreement or otherwise, whenever in the opinion of the Contracting Officer the aggregate of such payments shall be within the amount to which the Contractor will be entitled hereunder.
(b) Clause 7 of the “General Provisions” of the contract, as amended by Clause 30 of the “Additional General Provisions,” dealt with the subject of payments to the contractor and provided as follows:
7. PAYMENTS TO CONTRACTORS
(a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, or at more frequent intervals as determined by the Contracting Officer, on estimates made and approved by the Contracting Officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration. Such payments shall be made on submission of itemized requests by the Contractor and shall be subject to reduction for overpayments or increase for underpayments on preceding payments to the Contractor.
(b) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract: Provided, however, That the Contracting Officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full: And provided further, That on completion and acceptance of each separate building, public *710 work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentage thereon, less authorized deductions.
(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the Contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract.
(d) Upon completion and acceptance of all work required hereunder, the amount due the Contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the Contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the Contractor from the operation of the release in stated amounts to be set forth therein. If the Contractor’s claim to amounts payable under the contract has been assigned under the Assignment of Claims Act of 1940? as amended (41 U.S.C. 15), a release may also be required of the assignee at the option of the Contracting Officer.
(e) The obligation of the Government to make any of the payments required under any of the provisions of this contract _ (including those of Clauses 5 and 48) shall, in the discretion of the Contracting Officer, be subject to (1) reasonable deductions on account of defects m material or workmanship, and (2) any claims which the Government may have against the Contractor under or in connection with this contract. Any overpayments to the Contractor shall, unless otherwise adjusted, be repaid to the Government upon demand.
(c) Clause 25 of the “General Provisions” of the contract provided as follows:
25. WITHHOLDING OF FUNDS TO ASSURE WAGE PAYMENT
There may be withheld from the Contractor so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics employed by the Contractor or any subcontractor the full amount of wages required by this contract. In the event of failure to pay any laborer or mechanic all or part of the *711 wages required by this contract, the Contracting Officer may take such action as may be necessary to cause the suspension, until such violations have ceased, of any further payment, advance, or guarantee of funds to or for the Government Prime Contractor.
(d) Clause 31 of the “Additional General Provisions” of the contract provided in part as follows:
31. ASSIGNMENT OF CLAIMS
(a)Pursuant to the provisions of the Assignment of Claims Act of 1940 as amended (31 _U.S. Code 203, 41 U.S. Code 15), if this contract provides for payments aggregating $1,000 or more, claims for moneys due or to become due the Contractor from the Government under this contract may be assigned to a bank, trust company or other financing institution, including any Federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Notwithstanding any other provision of this contract, payments to an assignee of any moneys due or to become due under this contract shall not, to the extent provided in said Act as amended, be subject to reduction or set-off.
6. (a) In order to obtain performance and payment bonds in connection with the contract, as required by the Miller Act (40 U.S.C. 270a), the contractor on or about May 3, 1957, signed and submitted to the plaintiff an “Application for Contractor’s Bond” upon an appropriate form of the plaintiff.
(b) In the “Application for Contractor’s Bond,” the contractor indicated that it intended to borrow money from the Terre Haute First National Bank to finance the contract, and that it intended to make an assignment to the bank of payments becoming due under the contract.
(c) The application referred to in paragraph (a) of this finding contained the following provision:
5. In the event of the failure of the undersigned to comply with, or make due performance of any covenant hereof, including the agreement to pay premiums here- *712 inbefore stated, or of the hereinbefore described contract (s) to be bonded and/or the bond(s) in connection therewith, or in the event of claim of default under said contract (s) and/or bond(s), or under any other contracts guaranteed or bonds executed heretofore or hereafter for or at the instance or request of the undersigned, the Company may take such steps as it may deem necessary or proper to obtain due performance of such contract (s) and bond(s), including the right to sublet or assign the same, or its release from all liability under every and any such bond and contract, and to secure and further indemnify itself against loss; and all liability damages, loss, costs, charges and expenses of whatever kind and nature which the Company may sustain, incur or be put to in connection therewith shall be borne and paid by the undersigned.
And for the better protection of the Company, and as collateral security hereto and for all claims of the Com-Sany against the undersigned, the undersigned as of the ate hereof hereby assign, transfer and convey to the Company all the right, title and interest of the undersigned in and to all the tools, plant, equipment and materials of every nature and description that the undersigned may now or hereafter have upon said work, or in, on or about the site thereof, including as well materials purchased for or chargeable to said contract which may be in process of construction, in storage elsewhere, or in transportation to said site. Further, the undersigned as of the date hereof hereby assign, transfer and convey to the Company any and all payments, funds, moneys, or property due or to become due the undersigned under said contract(s), same to be paid to the Company and the residue, if any, after the Company be held harmless or reimbursed as aforesaid, to be paid to the undersigned or their legal representatives; and the undersigned as of the date hereof also hereby assign, transfer and convey to the Company all the undersigned’s rights in and to all subcontracts which may have been or may hereafter be entered into, and the materials embraced therein, also the undersigned’s rights, claims and demands against any Surety or sureties on bonds furnished by said such subcontractors. The condition of the above assignments and conveyances is that in the event the undersigned fail to discharge any obligations of any description incurred in the performance of said contract (s), or be unable to complete the said work pursuant to the terms of the contract (s) covered by said bond(s) *713 or in the event of any default by the undersigned under said contract (s), or of any claim or default under said bond(s), or likewise as to any other contract guaranteed or bonds executed heretofore or hereafter for or at the undersigned’s request, or of failure by the undersigned to make due payment of premium or premiums due the Company for execution of such bond(s), said assignment and conveyances shall be in full force and effect as of the date hereof, the Company at its option shall be sub-rogated to all rights, properties and interest of the undersigned in said contract or contracts, also subcontracts, and the undersigned hereby authorize and empower the Company, and nominate and appoint any officer, authorized agent or attorney of the Company, the true and lawful attorney of the undersigned with full right and authority, to receive, issue, sign and endorse the undersigned’s name or names to any voucher, check, release, bill of sale of equipment and/or materials aforesaid or any part thereof, satisfaction or paper necessary or desired to effect the purposes of these assignments and conveyances, and further to enter upon and take possession of said tools, plant, equipment, materials, contracts and subcontracts and enforce, use, employ and dispose thereof pursuant hereto, hereby ratifying and confirming all that said attorney or attorneys may lawfully do in the premises.
7. Sometime after the submission to the plaintiff of the application mentioned in finding 6, the contractor as principal and the plaintiff as surety executed two bonds and furnished them to the defendant. One bond was to secure the performance of the contract, and the other bond was to secure the payment of amounts due to persons supplying labor and materials in connection with the prosecution of the work provided for in the contract. The performance bond was in the penal sum of $640,389, and the payment bond was in the penal sum of $320,194.50. Both bonds bore the date of April 17,1957, although they were actually executed after that date.
8. On or about May 6, 1957, the contractor executed an assignment to the Terre Haute First National Bank under the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. 203). The assignment was executed for the purpose of obtaining funds with which to defray the construction, labor, and material costs incurred in the per *714 formance of the contract. Due notice of the assignment was given to the defendant and to the plaintiff, as required by the pertinent statute. ■ The notice was acknowledged by the plaintiff on May 21, 1957.
9. The contractor duly entered into performance of the work provided for in the contract.
10. Pursuant to the assignment mentioned in finding 8, the defendant made to the Terre Haute First National Bank several progress payments for work done by the contractor under the contract.
11. On February 21, 1958, the plaintiff’s representative in Indianapolis, Indiana, telephoned to the plaintiff’s central office in Pittsburgh, Pennsylvania, and expressed concern over the contractor’s financial situation. The plaintiff’s Indianapolis representative reported that a representative of the contractor had advised him that the contractor owed more than $90,000 in accumulated bills, that the “current draw” under the contract was only about $40,000, that the contractor did not have sufficient funds to meet the current obligations, and that the contractor wished to borrow from the plaintiff funds with which to continue performance of the contract.
12. On or about February 26, 1958, the contractor submitted its partial payment estimate No. 9 to the defendant’s Resident Officer in Charge of Construction under the contract. This estimate covered work which the contractor had performed under the contract during the monthly period that ended on February 24, 1958.
13. (a) Because of the unfavorable information previously received regarding the contractor’s financial condition (see finding 11), the plaintiff’s central office arranged for a conference to be held in Indiana on February 28,1958, between representatives of the plaintiff and representatives of the contractor. At this conference, the representatives of the plaintiff inspected the contractor’s books and records, and ascertained that unpaid bills totaling approximately $90,000 had been accumulated by the contractor in connection with the performance of the contract, whereas the contract earnings due the contractor at the time amounted only to about $40,000, which amount was already assigned to the Terre *715 Haute First National Bank. Approximately 60 percent of the work under the contract had been completed at the time.
(b) During the course of the conference mentioned in paragraph (a) of this finding, the plaintiff informed the contractor that it would be willing to advance funds to the contractor, but only if the contractor would comply with one of two alternative conditions, i.e., (1) that the contractor sign a voluntary default letter, which would be filed with the defendant, or (2) that the plaintiff and the contractor jointly work out with the Terre Haute First National Bank an agreement whereby the plaintiff would have priority over the bank with respect to future earnings under the contract in order to obtain reimbursement for the plaintiff’s advances. The contractor did not assent to either of these conditions, but instead requested that it be given a period of 10 days within which to attempt to obtain additional funds from other sources.
(c) As of February 28, 1958, the contractor was still performing the contract, but was seriously behind schedule.
(d) At the time of the conference mentioned in this finding, neither the plaintiff nor the contractor furnished any information to the defendant regarding the conference.
14. On March 3, 1958, the defendant’s Kesident Officer in Charge of Construction under the contract forwarded the contractor’s partial payment estimate No. 9 (see finding 12), together with his recommendation for payment thereon in the amount of $36,888, to the Officer in Charge of Construction, Ninth Naval District, Great Lakes, Illinois.
15. On March 10, 1958, the plaintiff’s secretary made a telephone call to a representative of the Officer in Charge of Construction, Ninth Naval District, and inquired as to when payment of the contractor’s partial payment estimate No. 9 would be made. The plaintiff’s secretary was informed that the estimate had been submitted by the contractor, and that under the customary procedure a period of from 7 to 10 days would be required in order to process the estimate and make payment on it.
16. A representative of the Officer in Charge of Construction, Ninth Naval District, prepared the voucher (No. 200802) on the contractor’s partial payment estimate No. 9 *716 for payment in the amount of $36,388, signed the voucher, and forwarded it on March 11, 1958, to the Eegional Accounts Office, Ninth Naval District, for further processing.
17. (a) The Eegional Accounts Office, Ninth Naval District, has a special “green slip” procedure that is sometimes utilized at the request of contractors in order to expedite payments on partial payment estimates. Upon receiving from a contractor information to the effect that the money on a partial payment estimate is needed in order to meet a payroll, the Eegional Accounts Office will usually attach a green slip to the pertinent papers and thereafter hand-carry the papers through all the various stages of the work involved in processing the estimate for payment. If such a call is received from a contractor by 9 or 9:30 in the morning, there is considerable likelihood that the matter will be processed and the check in payment will be mailed out the same day.
(b) The contractor involved in the present case had utilized the “green slip” procedure in connection with at least one previous partial payment estimate under the contract; and the contractor, either on March 12 or early on March 13, 1958, got in touch with the Eegional Accounts Office, Ninth Naval District, and asked that the “green slip” procedure be used in order to expedite the issuance of a check on the contractor’s partial payment estimate No. 9. In compliance with this request, the Eegional Accounts Office attached the customary green slip to the papers relating to the contractor’s partial payment estimate No. 9, hand-carried the papers through the various processing stages, and then mailed a check (No. 133355) in the amount of $36,388 to the Terre Haute First National Bank, as assignee under the contract, on March 13,1958.
18. Eepresentatives of the plaintiff and of the contractor met again in Indiana on March 13, 1958, for a further discussion of the contractor’s financial condition. It developed that the contractor had not, during the interval since the previous conference on February 28, 1958, been able to obtain funds with which to complete the contract. However, the contractor was still unwilling to agree to either of the *717 two alternative conditions demanded by the plaintiff (see finding 13 (b)).
19. (a) On March 13,1958, following the conference mentioned in finding 18, the plaintiff sent the following letter to the Officer in Charge of Construction, Ninth Naval District:
As Surety on the above contract, we have been informed that there are approximately $75,000 in unpaid labor and material bills and that the contractor is without funds to pay same.
Some of these suppliers and subcontractors have already filed notice of claim and demand for payment with us.
We, therefore, consider the contractor to be in default of his bond and contract by reason of his failure to pay labor and material suppliers and subcontractors.
Under the assignments and covenants contained in the contractor’s application, photostatic copy of which is attached hereto, and under our rights as surety, all monies now due or to become due under the contract, should be paid to us as surety.
Because of this and other reasons, we are hereby putting you on notice not to make payments to anyone other than us on this contract.
At the present time, we understand there is an estimate of approximately $36,380 which is being processed for payment and we request that you send such payment to us.
We will undoubtedly shortly be in touch with you regarding other features of this matter.
(b) The letter quoted in paragraph (a) of this finding was received after check No. 133355 had been mailed to the Terre Haute First National Bank. Up to that time, the defendant had not received from the plaintiff any information concerning complaints or demands for payment made to the plaintiff by creditors of the contractor, and it had not received from the plaintiff any indication that the latter considered the contractor to be in default under the bonds mentioned in findings 6 and 7.
20. On the morning of March 14, 1958, a representative of the plaintiff telephoned to the Regional Accounts Office, Ninth Naval District, and inquired regarding the status of the contractor’s partial payment estimate No. 9. The plaintiff’s representative was informed that a check (No. 133355) *718 in payment of partial payment estimate No. 9 bad been mailed to tbe Terre Haute First National Bank on March 13, 1958. The plaintiff’s representative thereupon asked that the Regional Accounts Office stop payment of the check, but he was advised that there did not appear to be an appropriate basis for such action.
21. The plaintiff obtained from an Indiana State court on March 14, 1958, an order restraining the Terre Haute First National Bank from collecting the proceeds of check No. 133355. The restraining order remained in effect until June 6,1958.
22. After the restraining order mentioned in finding 21 was obtained, a representative of the plaintiff on March 14, 1958, telephoned to the Regional Accounts Office, Ninth Naval District, and he also telephoned to a representative of the Officer in Charge of Construction, Ninth Naval District, and read the following statement to each of them :
Regarding Contract No. NBy-12599 with J. E. Russell & Sons Construction Company at Air Force Base Bunker Hill, Indiana, we are notifying you that we have obtained Court Order restraining collection by the Terre Haute First National Bank from the United States of America under Voucher No. 200802 or Check No. 133355 and that we are forwarding you today certified copy of said Court Order which, under Ruling of the United States versus Charles Borccheling [sic] 185 U.S. 223 (1902) requires any disbursing or finance officer of the United States to refuse any payment under said voucher and stop payment of any check issued in payment thereof and hold all contract funds for benefit of surety and unpaid labor and material suppliers at completion of work.
The conversations referred to in this finding were confirmed by the plaintiff in writing on the same day.
23. The plaintiff instituted the present action in the Court of Claims on March 14,1958.
24. As of March 14, 1958, when the events mentioned in findings 20-23 took place, the contract was still being performed, in that all the subcontractors, with the exception of the roofing subcontractor, were on the job. Performance was, however, far behind schedule.
*719 25. On March. 21, 1958, a representative of the defendant wrote a letter to the contractor expressing concern over the progress of the work and calling attention to a number of respects in which the contractor was behind schedule in the performance of the contract. This letter contained the following paragraph:
In summation of the foregoing, it can clearly be seen that the progress accomplishment on this project, eleven months after the award and less than sixty days from the date of completion, is unsatisfactory. You are hereby requested to take such actions as are necessary to fulfill your contract obligation by the scheduled completion date. Please advise this Office on or before 1200 hours (noon), 26 March 1958, what your intentions are with regard to prosecuting the contract accomplishment and completion by 15 May 1958.
26. As of March 31,1958, all work under the contract had stopped.
27. (a) On April 8, 1958, the defendant’s contracting officer wrote the following letter to the contractor:
Your Contract NBy-12599 (Specification No. 1360/ 56) for Construction of a Service Club at the U.S. Air Force Base, Bunker Hill, Indiana, is hereby terminated, in whole, effective immediately, for default due to your failure to make progress in the prosecution of the work and your default in performance. This is a final decision of the Contracting Officer.
(b) The contractor had completed approximately 62 percent of the work provided for in the contract when its right to proceed was terminated.
28. On or about April 25, 1958, the plaintiff entered into a contract with the defendant to complete the uncompleted work, including any remedial work that might be necessary, under the defaulted contract. The completion contract was numbered NBy-14743, and it provided for the payment to the plaintiff of a fixed price, $245,582. This amount represented the unearned balance under the defaulted contract.
29. The Terre Haute First National Bank presented check No. 133355 for collection and payment on June 12,1958, but the Treasury Department declined to make payment because of the pendency of the present action in the Court of Claims.
*720 30. The plaintiff satisfactorily completed all the work under the contractor’s defaulted contract and under the completion contract (see finding 28) by June 4, 1959.
31. (a) The defendant has withheld $45,000 out of the $640,389 that it was obligated to pay upon the satisfactory completion of the work covered by the defaulted contract. The amount withhold consists principally of the proceeds of check No. 133355 in the sum of $36,388; and the remainder represents part of the retained percentages out of the contractor’s earnings prior to the time of the default, less liquidated damages assessed against the contractor.
(b) The defendant does not contend that it is entitled to retain permanently any part of the sum previously withheld under the defaulted contract.
32. (a) The plaintiff asserts in the present litigation a claim to the $45,000 withheld by the defendant.
(b) The plaintiff has paid under the payment bond mentioned in findings 6 and 7 a total of $122,180.54 to creditors of the contractor in settlement of claims for labor and materials furnished in connection with the performance of the defaulted contract. The initial payment was made by the plaintiff on May 7, 1958. The plaintiff is also obligated to pay additional claims totaling $22,592.90 which have been submitted by the contractor’s laborers and materialmen; and there are more claims, totaling $11,483.17, which have been questioned and are awaiting disposition.
(c) The plaintiff first began to receive demands for payment from the contractor’s laborers and materialmen on March 4,1958. As of March 14,1958, two such demands had been received, one in the amount of $1,561.62 and the other in the amount of $11,250. All the other demands for payment were received subsequent to March 14, 1958.
33. The Terre Haute First National Bank asserts in the present litigation a claim to the $45,000 withheld by the defendant under the defaulted contract. This claim is based upon the assignment that is referred to in finding 8. No issue was raised in the pleadings or at the trial with respect to the bank’s contention that the contractor is indebted to it in the amount of $45,000 for funds which the bank, prior to the *721 contractor’s default, furnished to the contractor for use in the performance of the contract..
34. The contractor does not, in the present litigation, claim any part of the money withheld by the defendant.
35. No action on the claims asserted in this litigation by the plaintiff and by the Terre Haute First National Bank has been taken by Congress, or by any Department of the Government, or in any judicial proceeding.
36. There has been no assignment or transfer of the plaintiff’s claim or any part thereof.
37. There has been no assignment or transfer of the Terre Haute First National Bank’s claim or any part thereof.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff, National Union Fire Insurance Company of Pittsburgh, Pa., is entitled to recover, and it is therefore adjudged and ordered that the National Union Fire Insurance Company of Pittsburgh, Pa., recover of and from the United States the sum of eight thousand, six hundred twelve dollars ($8,612).
It is further concluded that the third party defendant, Terre Haute First National Bank, is entitled to recover, and it is therefore adjudged and ordered that the Terre Haute First National Bank recover of and from the United States the sum of thirty-six thousand, three hundred eighty-eight dollars ($36,888).